**UNITED STATES of America, Appellee,**

v.

**Gary LADD, Defendant, Appellant.**

**No. 89–1120.**

United States Court of Appeals, First Circuit.

Heard Aug. 3, 1989.
Decided Sept. 13, 1989.

Richard F. Johnston, Manchester, N.H., for appellant.

Robert E. McDaniel, Asst. U.S. Atty., Temple, N.H., with whom Peter E. Papps, Acting U.S. Atty., was on brief, for appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

April Poulin, William Massey, and defendant-appellant Gary Ladd embarked on an evening's entertainment featuring drugs of various kinds. Though steeped in merriment, the evening ended in dead earnest: Massey perished. Ladd was later indicted for distribution of heroin on the night in question. 21 U.S.C. § 841(a)(1). He was found guilty by a jury in the United States District Court for the District of New

Hampshire and appeals his conviction. We affirm.

There are four assignments of error. We mimic the defendant and consider the grounds in the order they were briefed, discussing the facts only to the extent necessary to place Ladd's contentions into meaningful perspective.

### A. *Admission of Laboratory Reports*

The parties stipulated that, following Massey's death, blood and urine samples were drawn from the corpse and delivered to a laboratory operated by the Massachusetts Department of Public Safety (State Lab). The stipulation ended at that point. The further course of the samples is shrouded in controversy.

The prosecution asserts that the samples were handled professionally at the State Lab; that scientific tests performed there indicated, *inter alia,* the presence of both cocaine and morphine-like substances; that a sample was then delivered to a private forensic laboratory (CSL) to conduct more sophisticated tests anent the presence of morphine[1]; and that, under the rigors of CSL's protocol, the sample tested positively for morphine. The prosecution offered into evidence both sets of test results: Exhibit 9 (the State Lab file) and Exhibit 7A (CSL's file). The district court admitted them over defendant's objection.

Ladd contends that the laboratory records should have been kept from the jury. He lands a series of hard blows related to (1) slipshod storage and handling of the samples at the State Lab, and (2) a discrepancy in the samples' identifying numbers. His knockout punch is that the chain of custody binding the samples was so seriously flawed as to leave no reliable foundation for admission of the test results. Appellant's argument has some merit, but in condemning the totality of the forensic evidence, he casts his net too wide; the State Lab results and the CSL results are birds of different feathers.

■ 1. *State Lab Results.* "[A]s a condition precedent to admissibility," evidence must be authenticated by a showing "sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). The district court stands as a sentinel at the gates. If in the court's judgment it seems reasonably probable that the evidence is what it purports to be, the command of Rule 901(a) is satisfied, and the evidence's persuasive force is left to the jury. *United States v. Williams,* 809 F.2d 75, 89 (1st Cir.1986), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1959, 95 L.Ed.2d 531 (1987); *United States v. Luna,* 585 F.2d 1, 6 (1st Cir.), *cert. denied,* 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). We review the court's threshold decision only for abuse of discretion. *See United States v. Masse,* 816 F.2d 805, 813 (1st Cir. 1987); *Williams,* 809 F.2d at 89–90.

As to the reports from the State Lab, the facts brook little dispute. The only witness who testified concerning the procedures employed at the facility was John Sloane, a state chemist. Sloane testified that the laboratory's usual custom and praxis were followed. His testimony supported a finding that the samples of Massey's bodily fluids, once delivered, were stored in a loosely-tied bag in a refrigerator in the laboratory; that the bag (if not the individual jars) was numbered and labelled; that the samples were removed for internal testing and eventually replaced; that the laboratory's procedures were followed on these occasions; and that the tested samples comprised Massey's blood and urine, respectively. This evidence, we think, was sufficient to sanction admissibility of the State Lab's reports.

To be sure, defense counsel's attack on the laboratory's protocol, and on the storage and handling of the specimens, was robust. He showed that access was easy and cross-checking minimal. He probed skillfully at weaknesses in the safeguards employed, casting doubt on the samples' security and on the effectiveness of the state's preventatives. Fundamentally, however, this cross-examination went to the weight of the evidence, not to its admissibility. *See Williams,* 809 F.2d at 89–90.

---

1. Morphine is the base ingredient of diacetyl- morphine (the drug commonly called heroin).

In the last analysis, the prosecution's chain-of-custody evidence must be adequate—not infallible. Here, some links in the chain were rusty, but none were missing. Without question, the defense succeeded in showing a certain sloppiness, regrettable in a forensic laboratory. Yet the net effect of any such disarray on the authenticity of the evidence depended on what inferences a reasonable factfinder might choose to draw from it. Where, as in this case, a trier chooses among plausible (albeit competing) inferences, appellate courts should not intrude.

In fine, the trial judge acted within his discretion in finding it reasonably probable that the test results from the State Lab were what the prosecution claimed them to be. The evidence was, therefore, duly admitted.

■ 2. *CSL Results.* The tests conducted by the private laboratory, CSL, do not fare nearly as well. When a blood sample is received by the State Lab, it is assigned an identification number. Massey's blood sample was numbered T87–1938–BBO. When the decision was made to forward the sanguineous specimen to CSL for more critical testing, a messenger called for it. According to CSL's records, the sample it received was numbered T87–1936–BBO. The last-digit discrepancy ("1938" versus "1936") was never explained. It was later struck over—the "6" altered to look like an "8"—but the record is silent as to when, where, how or why this emendation occurred. The record is likewise inscrutable as to the identity of the reviser.

Perhaps most puzzling, the prosecution made almost no effort to clear up the discrepancy. It chose not to present the testimony of the State Lab staffer who released the sample, the courier, or the CSL staffer who logged it in. Similarly, the prosecution offered no evidence to show whether the allegedly miswritten number (T87–1936–BBO) was assigned to some other specimen still in house, or to account for that designation. In short, there was no competent proof to indicate that the sample extracted from Massey's corpse was the one which CSL tested. An important step in the custodial pavane was omitted.

The conclusion is, we think, inescapable. As to CSL's findings, the linkage was not merely rusty—it had parted. Due to the missing link, the CSL test results should not have been admitted into evidence.

■ 3. *Harmless Error.* Our determination that the court below erred in admitting CSL's findings into evidence does not end this phase of our inquiry. Where, as here, an error is not of constitutional magnitude, reversal is not obligatory unless the bevue "affect[s] substantial rights." Fed. R.Crim.P. 52(a). Put another way, a new trial is unnecessary if it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). As we have recently observed, "the *Kotteakos* 'fair assurance' standard is satisfied if it is 'highly probable' that the challenged action did not affect the judgment." *United States v. Hernandez–Bermudez*, 857 F.2d 50, 53 (1st Cir.1988) (citations omitted); *see also United States v. Mazza*, 792 F.2d 1210, 1216–17 (1st Cir. 1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987); *United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981).

This is such a case. The disputed CSL report had significance in only a single material respect: as proof that the substance distributed by Ladd was heroin. Yet, that point was never really in doubt. Captain Brodeur of the Manchester police testified that Ladd confessed to providing heroin on the evening in question. An eye witness, Poulin, testified that the substance she obtained from Ladd that night was heroin. She also testified that Ladd "fronted" Massey two bags of heroin. Ladd's former roommate testified to an admission from which a similar inference could be drawn. *See infra* note 4. The report of the State Lab, properly admitted into evidence, indicated the probable presence of a

morphine-like ingredient.[2] And the government's expert witness, Jehru St. Valentine Brown, gave an opinion, based on circumstantial evidence (packaging, method of substance administration, and the like) and without any reliance on either set of laboratory tests, that the substance involved was heroin. The opposite pan of the scale was empty: all of the evidence was to the effect that appellant possessed heroin and Massey used it.

In light of the record as a whole, we believe it highly probable that the errant admission of the CSL report did not affect the judgment and, therefore, the mistake was harmless. This is especially so because the evidence had virtually no bearing on the defense's two main theories: (1) that Ladd merely shared drugs with Poulin and Massey recreationally as part of an all-night drug party, but did not "distribute" heroin to them; and (2) that Ladd's own drug usage that evening negated the existence of specific intent to commit the charged crime.[3] Given the contours of the case, and the state of the record, we are confident that the jury's judgment was not measurably swayed by the court's error. Because we discern no "realistic possibility that admission of the [tainted evidence] influenced the outcome of the trial," *United States v. Polito*, 856 F.2d 414, 420 (1st Cir.1988), we regard the error as benign.

### B. *References to Massey's Demise*

■ Before trial began, appellant moved *in limine* to exclude all references to Massey's death. Appellant debunked the relevance of such evidence and argued that its probative value (if any) was overwhelmed by the potential for prejudice. The district court rejected the motion as impractical, finding that no violation of Fed.R.Evid. 403 would result from the minimal amount of death-specific evidence likely to emerge. Ladd seems adequately to have preserved the point for appeal by (1) unsuccessfully asking the court to screen any such evidence out of the jury's presence as recommended by us in *United States v. Griffin*, 818 F.2d 97, 105 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987), and (2) requesting and receiving a continuing objection during the trial "to anything which presents any reference to the fact of the death."

We have combed the record and have found only isolated references to the fatality, none particularly provocative. The district judge, sensitive to the potential problem and obviously solicitous of defendant's rights, seemingly handled the matter with care and circumspection. Photographs of the body, for instance, were disallowed. Overall, the judge was assiduous in ensuring that, notwithstanding disclosure of the fact of Massey's demise, the proposition that Ladd killed him was not hawked.[4] On the one occasion that a witness (Poulin) volunteered information about the death, the judge struck the statement and ordered the jury to disregard it. The judge repeated this admonition in the charge. Nor has appellant adverted to any intentionally inflammatory use of the evidence by the government: indeed, the prosecutor did not mention Massey's death in his opening statement; and in his summation, he specifically told the jury:

> Now, [defense counsel] went into great detail about [moving the body] and the fact that Mr. Massey died. We submit to you that this case ends before Mr. Mas-

---

**2.** According to Sloane's uncontradicted testimony, the State Lab performed a morphine opiate screen on Massey's urine sample. That screen was positive for the presence of morphine-like substances. The CSL test, which Sloane described as more "detailed," was intended to provide additional confirmation of the presence of heroin in Massey's body.

**3.** To be sure, Ladd's counsel, upon discovering the mix-up in identifying numbers, made the most of it. That noted, we proceed to recognize the reality of events: no matter how much noise emanated as a result of the numerical conflict and the clumsy attempt at recension, the actual theories upon which the accused's adroitly-managed defense rested were cut from a much different cloth.

**4.** Timothy Martin, Ladd's quondam roommate, did testify that Ladd told him, in reference to Massey, that "it was [my] 'fucking shit' that killed the kid." Appellant does not complain about this testimony in his brief, and it seems clearly admissible on the issue of distribution.

sey even collapses. By then the offense is committed already by Mr. Ladd. The distribution. What follows is irrelevant. Makes no difference.

We need not paint the lily. By and large, the evidence was relevant. Massey's death following the night's revelry, though not an element of the crime charged, nevertheless "pertained to a chain of events forming the context ... and set-up of the crime," *United States v. Moreno–Morales,* 815 F.2d 725, 740 (1st Cir.), *cert. denied,* 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 397 (1987), helping to "complete the story of the crime on trial." *United States v. D'Alora,* 585 F.2d 16, 20 (1st Cir.1978) (citation omitted). We have regularly sanctioned admission of such evidence in appropriate cases, *see, e.g., United States v. Rodriguez–Estrada,* 877 F.2d 153, 155–56 (1st Cir.1989); *United States v. Fields,* 871 F.2d 188, 193 (1st Cir.1989); *United States v. Currier,* 821 F.2d 52, 55 (1st Cir.1987), where it possessed contextual significance.[5] Even grisly evidence—including evidence of homicides—has been admitted on this basis. *See Real v. Hogan,* 828 F.2d 58, 61 (1st Cir.1987) (citing cases); *Moreno–Morales,* 815 F.2d at 740.

Of course, relevancy alone is not the ultimate test. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed.R. Evid. 403. The chore of overturning a Rule 403 order is a strenuous one: the district court has broad discretion in gauging the probative value/prejudicial impact calculus. *See Griffin,* 818 F.2d at 101; *United States v. Tierney,* 760 F.2d 382, 387 (1st Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). The trier's weighing of the positive and negative effects of specific evidence demands considerable respect, especially when, as in this case, limiting instructions were deftly and timely deployed. *See, e.g., United States v. Marler,* 756 F.2d 206, 216–17 (1st Cir.1985) (discussing curative effect of lim-

iting instructions). As we have said: "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weight of probative value and unfair effect." *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1340 (1st Cir.1988).

Given the degree to which Massey's death was inextricably intertwined with the crime charged in the indictment, and the care demonstrated by the district court in handling the disputed evidence, we are satisfied that there is no basis for us to intervene.

### C. *Expert Testimony*

■ Appellant's third grievance need not detain us long. Ladd complains that the lower court erred in admitting the opinion testimony of Brown, a police officer/registered pharmacist with demonstrable expertise in narcotics trafficking, preparation, and use. Specifically, Ladd takes umbrage at the expert's conclusion that the packaging of the drugs and the number of packages possessed were consistent with distributive intent (as opposed to likely personal, recreational use). In defendant's view, the testimony was conjectural, irrelevant, and prejudicial. We think otherwise.

It is established beyond peradventure that the trial court enjoys leeway in deciding to admit or exclude expert testimony. *See United States v. Hoffman,* 832 F.2d 1299, 1310 (1st Cir.1987); *United States v. Wilson,* 798 F.2d 509, 517 (1st Cir.1986); *United States v. Hensel,* 699 F.2d 18, 38 (1st Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983). The judge must employ this discretion in assessing whether such opinion evidence will assist the jury to understand the proof or ascertain facts in issue. *See* Fed.R.Evid. 702. The same latitude extends to determining whether a proffered "expert" has the necessary qualifications to address the subject matter. *Hoffman,* 832 F.2d at 1310; *Marshall v. Perez Arzuaga,* 828 F.2d

---

5. Indeed, this case is less troublesome than cases such as *Rodriguez–Estrada* and *Fields* in

that the death was not allowed to be shown as an uncharged bad act, Fed.R.Evid. 404(b).

845, 851 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988).

In this case, the evidence was properly admitted. Defendant's intent was in question, and Brown's opinions were unarguably relevant as to that issue. The opinions also bore on the nature of the contraband. The witness was amply credentialed. And the field was a fertile one: jurors are not expected to be familiar with the idiom and workings of the heroin community. *See Hoffman,* 832 F.2d at 1310. Expert interpretation of drug jargon and practices, supplied by one versed in the business, has often been admitted to assist the trier of fact in drug-trafficking cases. *See, e.g., Hoffman,* 832 F.2d at 1310; *United States v. Rivera Rodriguez,* 808 F.2d 886, 888 (1st Cir.1986); *Hensel,* 699 F.2d at 38; *United States v. Golden,* 532 F.2d 1244, 1247–48 (9th Cir.) (per curiam), *cert. denied,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *United States v. Cirillo,* 499 F.2d 872, 881 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974).

The evidence was not only relevant and probative, but the court below also acted well within its discretion in declining to hold that the testimony's potential for prejudice overbalanced its value. The evidence had demonstrable probative worth, *see supra.* That it hurt the defendant's chances did not render it inadmissible. "By design, all evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." *Rodriguez–Estrada,* 877 F.2d at 156 (emphasis in original). There was no unfairness here.

### D. *Supplementary Jury Instructions*

Ladd's final argument is that the district court erred in its supplemental instructions to the jury. We set the stage.

At the end of the case, the district court charged fully on specific intent, telling the jury (as defendant had urged) that drug-induced influences at the time of the offense might negate specific intent. The court also instructed on the elements of a lesser included offense (possession of heroin). Ladd does not contest the suitability of these instructions.

The case was submitted on October 13, 1988. That afternoon, the jury asked for clarification of the charge on intent to distribute and on a "group having a party putting drugs on the table for their own use." The court repeated its instructions on distribution and specific intent. Defendant took exception, stating that the judge should have reinstructed on possession. Deliberations continued. On the following morning, the jury asked for—and received—clarification of the "possession" instruction. Defendant concedes that the court responded adequately to this inquiry [6] and stated the elements of the offense with precision. Early that afternoon, the jury sent yet a third note to the judge, seeking "clarification of the differences between general and specific intent." The court again obliged. This time, defendant objected to the failure to tell the jury that use of narcotics might negate specific intent. Ladd did not object to the supplemental instruction in any other respect.

The jury found Ladd guilty of distribution of heroin. The court—apparently concerned about defendant's last objection—refused to accept the verdict. The judge reinstructed the jury, *ore sponte,* that "specific intent can be diminished by the effects of a narcotic drug.... [and] can also be negated." The jurors were then sent to deliberate anew. They again returned with a guilty verdict on the distribution charge.

Defendant's unhappiness about these events seems rather fuzzy and unfocused. Insofar as the claimed error relates to the charge on negation of specific intent, Ladd appears to be whistling past the graveyard; the district court not only gave the appropriate charge originally, but its refusal to accept the first verdict and its

---

**6.** At this juncture, the jury also requested that certain testimony be reread and that the court explain the realm of possible verdicts. These requests were accommodated without objection from either side.

resubmission of the case to the jury with what amounts to the exact charge ringing in its collective ears, undermined any conceivable claim of harmful error. While we do not suggest that the court's belt-and-suspenders approach was necessary, it certainly served to obviate any doubt.

■ Defendant fares no better in connection with the lesser-included-offense instruction. Ladd does not contest the correctness of what the court said on this point. Rather, he seems to be hypothesizing that the train left the station when the judge answered the jury's first note without repeating this portion of the charge. But on that occasion, the jury requested—and received—reinstruction with respect to specific issues. The court expressly inquired whether the jury wanted "another recharge concerning lesser offense," and the jury foreman answered in the negative. No more was required.

The district court is not bound to submit to a party's wish list of charges to be ingeminated. Cf. United States v. Argentine, 814 F.2d 783, 787 (1st Cir.1987) (rereading of testimony rests in trial court's sound discretion). Decisions of that sort are committed to the court's informed judgment and discretion. See id.; see also United States v. Hyson, 721 F.2d 856, 865 (1st Cir.1983); United States v. Neiss, 684 F.2d 570, 572 (8th Cir.1982). Given that (1) the original lesser-included-offense instruction was clear and correct; (2) the jury manifested disinterest in possession when the judge answered the first note; and (3) the court carefully reexplained the elements of possession in reply to the second note, the court's latitude was not exceeded.[7]

Where a jury limits its request for reinstruction to one or more specific issues, the court should respond forthrightly, but not gratuitously. The judge is not required to guess as to other possible areas of jury confusion; robes and gavels are the tools of a jurist's trade—not tea leaves or crystal balls. There is a nice balance between acceptable helpfulness on the court's part and unacceptable intrusion into the jury's province. In the ordinary case, prudence dictates that the trial court should confine its response to the approximate boundaries of the jury's inquiry. See Neiss, 684 F.2d at 572; United States v. Andrew, 666 F.2d 915, 922 (5th Cir.1982); Grant v. Dalsheim, 535 F.Supp. 1382, 1386 (S.D.N.Y. 1982); see also Whiting v. United States, 321 F.2d 72, 75 (1st Cir.) (court not required to reread portions of charge not requested where nothing court said in answering jury question altered original instructions), cert. denied, 375 U.S. 884, 84 S.Ct. 158, 11 L.Ed.2d 114 (1963). This case lies well within the rule: the "jury ma[de] explicit its difficulties [and the] trial judge ... clear[ed] them up with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1945).

There was no abuse of discretion in the court's refusal to reinstruct the jury on the lesser included offense of possession after receipt of the first jury note. Nor was error perpetrated in any other material, preserved respect during the court's several supplemental instructions.[8]

---

7. Appellant's reliance on United States v. Velez, 652 F.2d 258 (2d Cir.1981), is greatly misplaced. There, the judge chose to respond to the jury's inquiry "by briefly recapitulating the essential elements of each offense [charged]." Id. at 261. He listed the essential elements of conspiracy, but neglected to mention the precise element which formed the cornerstone of the defense: "the one legal requirement Velez strenuously argued the Government had not proved." Id. at 262. Defense counsel immediately remarked the omission, but the court did not correct it. Id. at 261 & n. 4. The jury convicted Velez on the conspiracy charge. Id. at 261. The Second Circuit ordered a new trial. Id. at 262. The case at bar seems a far cry from Velez. Here, the judge did not omit an element of the offense, nor give the jurors misleading or incomplete answers to any of their questions. As Velez recognized, "a supplemental charge is not defective where it responds adequately to the jury's request for clarification." Id. at 262.

8. Appellant complains that, when giving supplemental instructions, the trial judge did not "reinstruct the jury on the burden of proof or ... caution the jury that all the instructions must be taken as a whole." Appellant's Brief at 25. Cautionary instructions of this sort are always helpful and might well bear repeating. Be that as it may, the short reply to Ladd's lament is that he neither asked the court to reinstruct in

### E. *Conclusion*

We need go no further. The record reflects that, on the whole, the district judge did a thoroughly professional job in the management of a case fraught with pitfalls. Ladd received a fair trial, albeit not a perfect one. In the absence of any demonstration of reversible error, the judgment of conviction must be

*Affirmed.*

this wise nor took objection to any "omission." In any event, both subjects—burden of proof and necessity of treating the charge as an entire-ty—were covered impeccably in the court's original instructions.